[Cite as *State ex rel. Yost v. Keegan Ents., Ltd.*, 2026-Ohio-961.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

STATE OF OHIO, EX REL. DAVE
YOST OHIO ATTORNEY
GENERAL

      APPELLEE

V.

KEEGAN ENTERPRISES, LTD., ET
AL.

      APPELLANTS

COURT OF APPEALS NO. {72}S-25-020
{72}S-25-021

TRIAL COURT NO. 23CV0319

## DECISION AND JUDGMENT

Decided: March 20, 2026

* * * * *

Dave Yost, Ohio Attorney General,
Cameron F. Simmons and Kelly D. Becker,
Assistant attorneys general, for appellee.

Daniel Keegan and DeAnna Keegan, pro se,
appellants.

* * * * *

**SULEK, J.**

{¶ 1} In this consolidated appeal, pro se appellants Daniel Keegan and DeAnna

Keegan appeal from the April 9, 2025 judgment of the Sandusky County Court of

Common Pleas imposing civil penalties against them and issuing a permanent injunction

requiring them to remove and dispose of all solid waste on parcels of land they own. For the following reasons, the trial court's judgment is affirmed.

## I. Background

{¶ 2} DeAnna Keegan, Keegan Enterprises, Ltd. ("Keegan Enterprises"), and Gordon Keegan[1] each own adjacent parcels of land that together comprise a multi-acre site at 7433 and 7475 State Route 101 in Townsend, Ohio (the "Site"). Daniel Keegan, who is DeAnna's son and Gordon's father, owns and operates Keegan Enterprises. Keegan Enterprises ran a recycling business at the Site that primarily involved the recycling of plastics received from nearby third-party manufacturing facilities. In addition, approximately six mobile homes are located on the Site, from which DeAnna earns rental income. Other portions of the Site are farmed.

{¶ 3} On April 21, 2023, the State filed a complaint against Daniel, DeAnna, and Gordon as well as Keegan Enterprises seeking civil penalties and injunctive relief related to solid waste that accumulated on the Site in connection with Keegan Enterprises's recycling business. The State alleged that appellants permitted open dumping of solid waste at the Site that caused three major fires to occur since 2020. Each fire required the Ohio EPA to respond. The complaint asserted causes of action for open dumping of solid waste in violation of R.C. 3734.03 (count 1); open burning of solid waste in violation of R.C. 3734.03 (count 2); operating an unlicensed and unpermitted solid waste disposal

---

[1] Gordon entered into a consent judgment with the trial court and is not a party to this appeal.

2.

facility in violation of R.C. 3734.05(A)(1) and R.C. 3734.02(C) (count 3); failure to pay response costs in violation of R.C. 3745.12 (count 4); and common law public nuisance (count 5).

{¶ 4} In August 2023, appellants entered a consent order for a preliminary injunction under which appellants agreed to remove approximately 11 acres of solid waste from the Site by November 30, 2023. Several months after that deadline, in April 2024, the State filed its first written charges in contempt and a motion to show cause. The State claimed that appellants had failed to comply with the terms of the consent order, alleging that the solid waste remained at the Site, appellants "had made little, if any, progress" in removing the waste from the Site, and appellants had not sought an extension to comply with the consent order.

### The May 29, 2024 Hearing

{¶ 5} On May 29, 2024, the trial court held a hearing on the State's first written charges in contempt and motion to show cause. At the hearing, the State presented the testimony of Mary Ann Miller, an employee of the Ohio EPA, who testified in conjunction with several photographs of the Site. At the beginning of Miller's testimony on direct examination, the following exchange occurred:

Q. And could you briefly describe your educational background?

A. I have a Bachelor of Science degree from –

    THE COURT: She graduated in 1984 from Fremont Ross High School, and that class produced some of the greatest persons probably in this entire County, and you may continue, Mr. Simmons.

    (LAUGHTER).

3.

THE COURT:  Sorry.

Miller went on to testify, in conjunction with several photographs of the property, that appellants had made no progress on removing the solid waste from the Site since August 2023.  Later, on recross, Miller was questioned as follows:

Q. Ms. Miller, you're personally familiar with the Judge?

A. We went to high school together.

Q. You went to high school together?

A. Yes.

> MR. SIMMONS [ON BEHALF OF THE STATE]: And, Your Honor, if you'll indulge me, (chuckle), I don't mean any kind -- 'cause I don't know --
>
> THE COURT:  He's going to ask when.
>
> MR. ANDERSON [ON BEHALF OF APPELLANTS]: No.
>
> THE COURT: Oh.
>
> THE WITNESS: 40 years ago.
>
> (LAUGHTER).

Q. Okay.  But he also recognized you by name at the beginning of the hearing, correct, in –

A. Yes.

Q. -- in the courtroom.  Do you socialize at all with the Judge?

A. No, sir.

Q. Okay.  Would you say that in any way you have an ongoing relationship with him that is anything more than professional?

A. No, sir.

{¶ 6} Daniel then testified that he had been unable to remove the waste.  He testified that Keegan Enterprises had experienced significant financial strain in 2020, it no longer had any employees on its payroll, and he could not afford to pay anyone to

4.

remove the waste. Moreover, he contended that his attempt to obtain a grant to fund the removal was thwarted by the Ohio EPA. He asserted that he had planned to remove the waste himself, but he experienced significant medical problems that required surgery after the August 2023 consent order was entered. Due to his physical condition, he had been unable to obtain a commercial driver's license to drive the trucks necessary for the removal. He also could not operate other equipment he owned, including a backhoe and a forklift, to move the materials because of damage to that equipment that he could not afford to repair. Next, although he originally planned to coordinate with a facility in Mount Vernon, Ohio to receive the waste, that did not work out due to issues with the facility. Finally, Daniel believed the fires were caused by arson committed by a third-party individual. On cross-examination, Daniel conceded that he had continued to accept one or two loads of plastic material even after the Ohio EPA issued a notice of violation in 2022 instructing Keegan Enterprises to stop accepting waste.

{¶ 7} Following the hearing, the trial court found appellants guilty of contempt under R.C. 2705.02(A) and scheduled a dispositional hearing for August 8, 2024. The trial court continued the hearing until September 9, 2024 after granting the motion to withdraw filed by appellants' attorney, who represented all four defendants. Daniel, DeAnna, and Gordon were pro se for the remainder of the proceedings in the trial court.

### The September 9, 2024 Hearing

{¶ 8} Appellants filed a complete transcript of the September 9, 2024 dispositional hearing. Gordon and DeAnna appeared, but Daniel was not present. At the hearing,

5.

Miller again testified, this time in conjunction with video from an August 4, 2024 drone flight over the Site, that none of the solid waste appeared to have been removed from the Site. Gordon and DeAnna both testified that despite their ownership of portions of the Site, they had no control over Keegan Enterprises and they could not do anything to remove the waste from the Site. Gordon also testified that he had attempted to help Daniel to remove the waste by organizing some of the materials and mowing the grass. Following the hearing, the trial court imposed a $100 fine on all four of the defendants and a 15-day jail term on Daniel.

### The October 10, 2024 Hearing

{¶ 9} The trial court then held a hearing on October 10, 2024 on the purge terms. The only defendant who appeared at the October 10, 2024 hearing was Gordon. At the outset of the hearing, the State again called Miller to testify. Before she was sworn in as a witness, the following exchange occurred:

> THE COURT: And I think they – the one attorney asked before, you and I went to school together. We don't otherwise socialize or … saw you at an event thing earlier in the year, but …
>
> THE WITNESS: Correct.
>
> THE COURT: Okay.

Miller then confirmed that none of the solid waste had been removed from the Site, comparing drone images of the Site taken on August 4, 2024 and October 6, 2024. Gordon testified that although he owned a portion of the Site, Keegan Enterprises owned all the solid waste and therefore he could not remove it. He stated that he did not have the financial ability to pay for the removal.

6.

**{¶ 10}** Following the hearing, the trial court issued an order containing the contempt sanctions and found that appellants could purge their contempt by removing the waste from the Site. The court's order imposed progressive deadlines for the waste's removal, requiring the appellants to remove 20 loads of waste per month and to submit documentation of compliance for the next three months.

*The December 2024 Bench Trial*

**{¶ 11}** The State filed an amended complaint, dismissing count 2 of the original complaint. In December 2024, the trial court held a three day bench trial on counts 1, 3, 4, and 5. Notably, appellants did not file a complete trial transcript with this court, filing instead only pages 1-24 of the transcript from the second day of trial. That portion of the transcript reflects that the parties had conducted a visit to the Site in the morning. Upon returning to the courtroom, the trial court inquired into whether the parties had reached a settlement, and they said they had not. The following exchange then occurred regarding the medical condition of Daniel, who was serving his jail sentence for his contempt citation when not at the courthouse for trial:

> THEREUPON, Mr. D. Keegan sighed loudly, (indicating).
>
> THE COURT: You all right?
>
> MR. D. KEEGAN: I told – I told you this morning, I got to have my meds.
>
> [DANIEL KEEGAN'S WIFE]: [The jail staff] didn't give him his medicine.
>
> THE COURT: Okay.
>
> …
>
> MR. D. KEEGAN: My blood pressure's through the roof.

7.

MS. D. KEEGAN: We called – we called the Sheriff's Department last night trying to get his – his blood pressure medicine and they – they're not giving it to him.

THE COURT: Was the medicine dropped off in a prescription bottle to the jail?

….

MR. D. KEEGAN: I've had two heart attacks, five stents. I had –

…

THE COURT: Madam Bailiff, can you please call the jail nurse and find out what the status is of medicine that was dropped off for Mr. Keegan and to have that reported back to me, please? I will find out what's going on.

MR. D. KEEGAN: I appreciate it.

THE COURT: Okay. All right. Is everybody ready then to continue with the trial? Mr. Simmons, we're still in your case.

MR. SIMMONS: Yes, Your Honor.

THE COURT: Mr. Keegan?

MR. D. KEEGAN: I – I'd – I'm – I'd like to withdraw from this today. I – I can't think right.

…

MR. D. KEEGAN: My head – my head is pounding.

THE COURT: Okay.

MR. D. KEEGAN: I'm – is it – is it something that I have to do?

THE COURT: Tell me what you're – tell me what you're requesting, Mr. Keegan.

MR. D. KEEGAN: To get my meds so I can think right – think straight.

THE COURT: Court's going to take –

MR. D. KEEGAN: I might not be making the right decisions.

THE COURT: The Court's going to take a brief adjournment until we have an opportunity to speak to the – jail nurse –

….

8.

THE COURT: … It's my understanding that the medicine that was dropped off for you, Mr. Keegan, was all outdated and –

…

THE COURT: The nurse has requested from the doctors' offices updated prescriptions, which can take quite a bit of time according to the nurse….

THE COURT: Okay. Here's what we're going to do. We are scheduled for tomorrow as well, and what I am going to do is I am going to furlough Mr. Keegan for today.

…

THE COURT: I'm going to release you on a furlough to take care of the medicine –

MR. D. KEEGAN: Okay.

THE COURT: -- and the medical issues that you are presenting

…

THE COURT: -- to the Court.

…

THE COURT: … I am taking you at your word that you're medically unable, and Mr. Simmons, I – you may or may not agree, but if any attorney told me that they were unable to – medically to proceed, I would give them the benefit of the doubt temporarily, but you'll have – you'll be furloughed from your 15-day sentence effective immediately. They'll have to process you out, but you'll be back here tomorrow morning at 8:30 and we will do –

MR. D. KEEGAN: Yes.

THE COURT: -- the rest of this trial –

MR. D. KEEGAN: (Nod indicating yes).

THE COURT: --all day tomorrow. What you will have an opportunity to do is take care of updating your medicine or taking medicine or whatever. You will show back up tomorrow at 8:30. Do you understand that?

MR. D. KEEGAN: Yes.

**{¶ 12}** After discussing whether certain witnesses would be needed for the next day, the trial court again questioned Daniel as follows:

> THE COURT: … So, Mr. Keegan, do you have any questions for me about what's happening right now and what is going to happen as the day progresses and tomorrow at 8:30 comes around?
>
> MR. D. KEEGAN: I believe not. You're going to release me on a furlough, and I'll be back here in the morning at 8:30.
>
> THE COURT: And I would certainly hope that you take that opportunity to get your medicine ---
>
> MR. D. KEEGAN: I have to –
>
> THE COURT: --straightened out.
>
> MR. D. KEEGAN: -- and I have to because I can't – I can't make any decisions and –
>
> THE COURT: Okay.
>
> MR. D. KEEGAN: -- think.
>
> THE COURT: And, you know I'm sure your wife [who is a nurse] can help you. She's –
>
> MR. D. KEEGAN: She will.
>
> THE COURT: --she – she will be able to help you, and we'll be back tomorrow at 8:30.

Appellants did not file transcripts for any other portion of the trial. The trial court's records indicate that the trial concluded on December 11, 2024.

### *The Trial Court's April 7, 2025 Judgment Entry*

**{¶ 13}** Following the trial, the trial court issued a judgment entry finding Daniel, Keegan Enterprises, and Deanna Keegan jointly and severally liable for count 1, open dumping of solid waste, as well as count 5, creation of a public nuisance. The court also found Daniel and Keegan Enterprises jointly and severally liable for count 4, failure to

10.

pay Ohio EPA emergency response costs. The court found appellants not liable for count 3, operating an unlicensed and unpermitted solid waste disposal facility.

{¶ 14} The court's order included several factual findings relating to liability, including the following:

> Through the years of open dumping, the Defendants have cultivated an expansive solid waste footprint, including 1) large mounds of burn residuals from the massive fires, 2) large piles of disposed cardboard, 3) thousands of containers off-spec plastics, which are now spilling from their dilapidated and deteriorated cardboard containers, and 4) high stacks of old, weathered wooden pallets. Even after multiple fires, Defendants continued to accumulate more and more solid waste, eventually expanding onto [DeAnna] Keegan's parcel. The State put forth evidence at trial that Defendants have taken no steps to remove any solid waste at the dump Site.

In addition, the court found that after each of the three major fires, the Ohio EPA's Office of Emergency Responses responded and sent an invoice for reimbursement of approximately $5,000 in costs. As to public nuisance, the trial court found that "the current levels of solid waste at Defendants' Site present a significant fire risk, threatening the citizens of Sandusky and Erie Counties," citing the testimony of a county official and a fire chief that the materials at the Site are "extremely combustible" and that an additional fire at the Site would be life-threatening to emergency responders and nearby residents.

{¶ 15} As to the civil penalties, the court made several additional findings, including relating to the risk of harm created by the accumulation of solid waste at the Site, finding that the waste was highly combustible and posed the risk of a severe and imminent harm to the environment, human health, and nearby residences. As to

11.

recalcitrance, the court primarily pointed to the appellants' failure to take any action to remove any waste from the Site, even after entering the August 2023 consent order. In addition, the court noted that although Daniel and Keegan Enterprises were primarily responsible for the accumulation of materials at the Site, DeAnna had a contractual relationship with Keegan Enterprises in which she received payments for the use of her parcel. The court also found that DeAnna was aware of the fires that occurred at the Site.

{¶ 16} As to economic benefit, the court found that Daniel received payment from customers to take the waste that was dumped on the Site, he economically benefited by not removing the waste from the Site, and he received monthly lot-rental payments from residents of the Site. As to DeAnna, the court found that she "testified that she did not care what Daniel Keegan did on her parcel, so long as he was paying her," and Keegan Enterprises paid her $30,000 for use of her parcel. In addition, DeAnna also received monthly lot-rental payments and economically benefited by not taking any action to remove the waste from her parcel.

{¶ 17} Based on its findings, the court imposed civil penalties against Keegan Enterprises, Daniel, and DeAnna. In addition, the court imposed injunctive relief, ordering appellants to comply with applicable laws and to "remove and lawfully dispose of all solid waste" according to a schedule, and prohibiting appellants from disposing of, accepting, or storing any solid waste at the Site or permitting third parties to do so. In addition, Daniel and Keegan Enterprises were ordered to reimburse the Ohio EPA for its response costs.

12.

## II. Assignments of Error

{¶ 18} Appellants each filed individual merit briefs. In his merit brief, Daniel asserts the following assignments of error for review:

1. The trial court erred by misapplying legal precedent without considering the lack of compensation, intent to recycle, or business disruption due to fire and an order to shut down by the Ohio EPA. The conviction was against the manifest weight of the evidence.

2. The trial court's judgment was not supported by sufficient evidence to meet the burden of proof. The court's findings were based on assumptions, not evidence.

3. The trial court violated Daniel Keegan's due process rights by proceeding with trial while he was medically impaired and unable to effectively participate in his own defense.

4. The trial court failed to ensure a fair and impartial proceeding by not recusing itself despite a conflict of interest involving the Plaintiff's representative.

In her merit brief, DeAnna asserts the following assignments of error for review:

1. The trial court erred by misapplying legal precedent without considering the lack of compensation, intent to recycle, or business disruption due to fire and an order to shut down by the Ohio EPA.

2. The trial court's judgment was not supported by sufficient evidence to meet the burden of proof. The court's findings were based on assumptions, not evidence.

3 The trial court failed to ensure a fair and impartial proceeding by not recusing itself despite a conflict of interest involving the Plaintiff's representative

13.

## III. Law and Analysis

{¶ 19} As a preliminary manner, appellants' first and second assignments of error, which concern the weight and sufficiency of the evidence, will be considered together. Not only are the assignments of error nearly identical, appellants make similar arguments in support of these assignments of error. Likewise, because Daniel's fourth assignment of error is identical to DeAnna's third assignment of error, and they make identical arguments in support of those assignments of error, they will be considered together. Daniel's third assignment of error, which concerns only his individual circumstances, will be considered last.

### A. The Weight and Sufficiency of the Evidence

{¶ 20} Appellants' first two assignments of error challenge the sufficiency of the evidence and the weight of the evidence to support the trial court's findings. They contend that the trial court erred in finding that appellants were paid for accepting the plastic. In addition, they contend there was no evidence that they attempted to evade disposal regulations, the materials were waste, or they abandoned the materials.

{¶ 21} Although appellants filed a small portion of the trial transcript, that portion only concerned the court's adjournment of trial proceedings for the day due to Daniel's health and is not a complete record of the evidence presented at trial. As the parties challenging the trial court's judgment, appellants "bear[] the burden of showing error by reference to matters in the record." *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980). To that end, App.R. 9(B)(4) provides that "[i]f the appellant intends to

14.

present an assignment of error on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the weight of the evidence, the appellant shall include in the record a transcript of proceedings that includes all evidence relevant to the findings or conclusion."

{¶ 22} Because appellants did not file a complete transcript of the trial, this court has no record from which to review the evidentiary support for the trial court's findings, and instead, this court must presume the regularity of the trial court's proceedings. *Lash v. Hood*, 2023-Ohio-2010, ¶ 9-10 (6th Dist.); *see also Terry v. Kellstone, Inc.*, 2013-Ohio-4419, ¶ 16 (6th Dist.) (holding that without a complete record, an appellate court "cannot conclude that the trial court's judgment with respect to [liability] was against the manifest weight of the evidence"). Accordingly, appellants' assignments of error relating to the weight and sufficiency of the evidence are without merit.

{¶ 23} Appellants' first and second assignments of error are not well-taken.

## B. Judicial Bias

{¶ 24} Daniel's fourth assignment of error and DeAnna's third assignment of error contend that the trial proceedings were not "fair and impartial" because the trial judge had a conflict of interest and his conduct violated the Code of Judicial Conduct. In support, appellants highlight that Miller, a key witness for the State, attended high school with the trial judge, and appellants contend Miller and the trial judge's "conduct during pretrial and trial proceedings appeared unusually familiar and collegial." Appellants further allege the following:

15.

> [O]n the very first day in the courtroom before trial officially began, Judge Ickes interrupted Mary Ann Miller while she was stating her educational background and interjected with a public comment to the courtroom referring to her as part of "the bright minds of [their graduating class]," clearly referencing their shared history. This public display of familiarity occurred before a word of testimony had been heard and contributed to the appearance of favoritism and partiality that permeated the remainder of the proceedings.

Appellants appear to be referring to the trial court's statement at the outset of the May 29, 2024 hearing on the State's contempt charges, during which the court interrupted Miller's response to a question about her educational background to state that "[s]he graduated in 1984 from Fremont Ross High School, and that class produced some of the greatest persons probably in this entire [c]ounty."  Later in that hearing, appellants' counsel cross-examined Miller about her relationship with the trial judge, and she admitted to attending high school with the trial judge but she denied socializing with the judge or having anything other than a professional relationship with him.  Other than those questions, in the ensuing 10 months in which this case was pending in the trial court, appellants did not raise the trial judge's relationship with Miller or otherwise object to the trial judge's continuing to preside over the proceedings.

{¶ 25} R.C. 2701.03 provides that if a party believes that a common pleas court judge is disqualified to preside in a proceeding, the party may file an affidavit of disqualification with the clerk of the Ohio Supreme Court.  "R.C. 2701.03 provides the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced." *Duggan v. Village of Put-In-Bay*, 2001 WL 477168, *5 (6th Dist. May 4, 2001).  "When the litigant fails to file an affidavit of disqualification of the trial court

16.

judge with the clerk of the Supreme Court, the litigant forfeits its complaint on this subject on appeal." *State v. Guildoo*, 2021-Ohio-4553, ¶ 47 (7th Dist.), citing *State v. Rhoades*, 2020-Ohio-2688, ¶ 22 (10th Dist.). Indeed, "[a] defendant cannot forgo this procedure and present the issue to the court of appeals in order to avoid Supreme Court jurisdiction." *State v. Donald*, 2011-Ohio-3400, ¶ 2 (7th Dist.).

{¶ 26} Nonetheless, this court has previously recognized that although "we cannot review the denial of a motion to recuse, … we *can* review for judicial bias that affected a litigant's due-process rights." *State v. Stratton*, 2025-Ohio-1621, ¶ 23 (6th Dist.), citing *State ex rel. Hough v. Saffold*, 2012-Ohio-28, ¶ 2; *State v. Elkins*, 2024-Ohio-5351 (6th Dist.); *Matter of C.S.*, 2023-Ohio-3754, ¶ 24 (4th Dist.). However, our review of judicial bias has been limited to those cases in which the appellant was unaware of the potential for judicial bias in time to file an affidavit of disqualification with the Ohio Supreme Court. *See Stratton* at ¶ 22 (explaining that the appellant could not have filed a timely affidavit of disqualification because the trial judge disclosed his relationship with a material witness for the State after the date on which the affidavit was due); *Elkins* at ¶ 13 (6th Dist.) (explaining that appellant's failure to file an affidavit of disqualification was not dispositive of claim of judicial bias on appeal because the trial judge did not disclose his relationship with a material witness during the pendency of the trial court's case).

{¶ 27} R.C. 2701.03(B) provides that "[a]n affidavit of disqualification … shall be filed with the clerk of the supreme court not less than seven calendar days before the day on which the next hearing in the proceeding is scheduled." Here, appellants had notice of

17.

the trial court's relationship with Miller as of the May 29, 2024 hearing. The next hearing after May 29, 2024 was scheduled for August 8, 2024, giving appellants over a month to file an affidavit of disqualification with the Ohio Supreme Court, but they did not do so. Further, after the trial judge disclosed at the October 10, 2024 hearing that he had attended the same event as Miller earlier that year, appellants again had more than seven days until the next scheduled hearing in which to file an affidavit of disqualification, and again, appellants did not do so. Because appellants had notice of the facts on which they base their allegations of judicial bias in sufficient time to file an affidavit of disqualification but failed to do so, they have forfeited their claim of bias on appeal.

{¶ 28} Moreover, even if appellants were not required to file an affidavit of disqualification to preserve this issue for appeal, the record does not support their allegations of judicial bias. "Trial judges are 'presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.' " *Preston v. Shutway*, 2013-Ohio-185, ¶ 16 (2nd Dist.), quoting *Weiner v. Kwait*, 2003-Ohio-3409, ¶ 89-90 (2d Dist.). Judicial bias sufficient to implicate a litigant's due-process rights requires " 'a deep-seated favoritism or antagonism that makes fair judgment impossible.' " *Elkins* at ¶ 12, quoting *Jackson v. Cool*, 111 F.4th 689, 696 (6th Cir. 2024), quoting *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013). The issue is whether "the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." (Internal quotations

18.

omitted and citations omitted from original.) *Id.*, quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872, 881 (2009). Notably, in *Elkins* and *Stratton*, this court found the potential for judicial bias where the lead detective for the State was the trial judge's stepson, a close family relationship that would make the average judge unlikely to be neutral. *Elkins* at ¶ 8, 14; *Stratton* at ¶ 24-25.

{¶ 29} Here, the record reflects that the trial judge's relationship with Miller was limited to attending high school with her decades earlier, recognizing her at the May 29, 2024 hearing, and attending the same event as her on one occasion. Both Miller and the trial judge denied socializing with each other or having a relationship beyond a professional one. Unlike in *Elkins* and *Stratton*, there is no evidence in the record of a close relationship between the trial judge and the State's witness or that he held a "deep-seated favoritism" for her. Nor is there anything in the record suggesting that an average judge would not be neutral when faced with a witness with whom he had attended high school decades earlier. *See Preston v. Shutway*, 2013-Ohio-185, ¶ 17 (2nd Dist.) (explaining that a previous professional relationship between the trial judge and one of the parties did "not, alone, create an appearance of impartiality"). Accordingly, appellants failed to point to anything in the record to support that their due-process rights were violated by judicial bias.

{¶ 30} DeAnna's third assignment of error and Daniel's fourth assignment of error are found not well-taken.

19.

## C. Daniel Keegan's Medical Condition

**{¶ 31}** In his third assignment of error, Daniel contends that his due-process rights were violated because he was forced to "represent himself while … physically and cognitively impaired," and he was thus unable "to understand the proceedings, respond appropriately, and present a coherent defense." Although Daniel concedes that the trial court furloughed him from jail due to his condition, he contends that the "proceedings continued" while he was unable to represent himself.

**{¶ 32}** Again, Daniel filed only a portion of the trial transcript. The portion of the trial transcript filed with this court reflects that on December 10, 2024, the second day of trial, the trial court stopped the proceedings when Daniel appeared to be unwell and inquired into his condition. The court then adjourned for the day, continuing the trial until the next day, December 11. Daniel agreed to return to the courtroom on December 11 after straightening out his medication issues. Accordingly, the record reflects that the trial court stopped the proceedings almost immediately after becoming informed of Daniel's medical condition, contradicting Daniel's assertion that he was forced to participate in trial despite being medically unable to do so. Moreover, because Daniel did not file a transcript for the trial proceedings on December 9 or December 11, there is no evidence in the record to support that Daniel was medically unable to appear at trial or represent himself on those days, and this court must presume the regularity of those proceedings. *Lash*, 2023-Ohio-2010 at ¶ 9-10.

**{¶ 33}** Daniel's third assignment of error is found not well-taken.

20.

## IV. Conclusion

**{¶ 34}** For the foregoing reasons, the judgment of the Sandusky Common Pleas Court is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

_____
Charles E. Sulek, J.                              JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.